ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

DANIEL PASTOR (CABN 297948)
JOSEPH TARTAKOVSKY (CABN 282223)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    daniel.pastor@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 19-CR-226-RS-1 |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Chief Judge:  Hon. Richard Seeborg |
| LORENZO LEE, a/k/a "O.G.," | Sentencing Date:  April 15, 2024 Time:  9:30 a.m. |
| Defendant. | |

## I.    INTRODUCTION

Defendant Lorenzo Lee (age 70) has pleaded guilty to Count One of the captioned Indictment charging him with Conspiracy to Distribute and to Possess with Intent to Distribute Cocaine, Cocaine Base, Heroin, and Methamphetamine.  Between roughly August 2017 and April 2019, Lee operated in the East Bay as a kilogram-quantity supplier of cocaine and cocaine base.  Lee generally obtained kilos of cocaine from his Mexico-based source of supply "Juan."  Lee divided the kilos of cocaine and sold them to street-level drug dealers.  The street-level dealers to whom Lee sold cocaine include co-

1  defendants Jeffrey McCoy and Timothy Peoples.  Lee also worked with fellow East Bay drug supplier

2  Jose Delgadillo (aka "Tepa") to source cocaine for sale to street-level dealers.  Delgadillo also had

3  connections to the Mexico-based supplier Juan.

4  In addition to buying cocaine from his supplier Juan, Lee permitted Juan to use Lee's Antioch

5  house to store stashes of other drugs such as methamphetamine, which were later picked up and moved

6  elsewhere by Juan's drug couriers.  This practice was highlighted by the events of February 8-9, 2019

7  when Lee and Juan and Lee and couriers for Juan were intercepted on calls coordinating the arrival to

8  and pickup of drug shipments from Lee's Antioch house through the federal wiretap of Lee's phone.

9  In the parties' plea agreement (Dkt. 473), Lee agrees that he is responsible for at least 1,251

10  grams of a mixture and substance containing cocaine, 8,690 grams of methamphetamine, and 756 grams

11  of a mixture and substance containing heroin.  *Id.* at 6; PSR ¶ 32.  Although Count One of the

12  Indictment charged Lee with conspiracy to distribute drug quantities that carry 10-year and 5-year

13  mandatory minimum sentences, Lee has satisfied the safety valve criteria of 18 U.S.C. § 3553(f) and is

14  therefore not subject to a mandatory minimum term of imprisonment.

15  **II.   SENTENCING GUIDELINES CALCULATIONS**

16  As reflected in the PSR, the Sentencing Guidelines calculation for Lee's offense is as follows:

17  a.   Base Offense Level, U.S.S.G. § 2D1.1(c)(1):                                  38

18  b.   Specific Offense Characteristic: 2D1.1(b)18)                                -2

19  c.   Acceptance of Responsibility, U.S.S.G. § 3E1.1:                         -3

20  d.   Zero-Point Offender, U.S.S.G. § 4C1.1                                         -2

21  e.   Total Offense Level:                                                                   31

22  *See* PSR ¶¶ 37-46. The government agrees with the Probation Officer's criminal history calculation

23  showing that Mr. Lee has a criminal history category of I with no scoreable criminal history.  PSR

24  ¶¶ 48-66. The applicable guidelines range is therefore 108-135 months.  PSR ¶ 87

25  **III.   DISCUSSION**

26  The Court must impose a sentence sufficient, but not greater than necessary, to reflect the

27  seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate

28

2

GOV. SENTENCING MEMO.
NO. 3:19-CR-0226-RS-1

deterrence; to protect the public; and to rehabilitate the defendant.  18 U.S.C. § 3553(a)(2); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Guidelines are "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

Section 3553(a) sets forth factors that the Court must consider in determining an appropriate sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims.  18 U.S.C. § 3553(a); *Carty*, 520 F.3d at 991.  Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  *Rita v. United States*, 551 U.S. 338, 350 (2007).

### A.  The Offense – Lorenzo Lee was an East Bay Cocaine Supplier

The wiretap investigation in this case centered around Lorenzo Lee whose phones were intercepted during the three 30-day interception periods. Lee regularly supplied cocaine and cocaine base to street level dealers including co-defendants Jeffrey McCoy and Timothy Peoples.  PSR ¶¶ 17, 18-24.  Lee was assisted in his drug distribution by co-defendant Anthony Brown.  Lee obtained kilograms of cocaine from his Mexico-based source of supply "Juan," which he divided and sold to street-level drug dealers.  Lee claimed to drug associates that he was one of Juan's major customers.  In July 2018 calls played at trial, Lee pressed Juan to provide a greater supply of cocaine.



Lorenzo Lee: East Bay Cocaine Distributor

LEE: "I'm his numero uno…. **I know before it cross the border**" (EX-101, July 27, 2018, 2:43 pm, w/ unknown male, 0:33-0:36)

LEE: "OK, so **it's already over here**? … Hey Juan, listen…we got people calling that ain't called in a while… I got tickets probably for **five**, right now" (EX-102, July 27, 2018, 2:46 pm, w/ "Juan," 1:04-0:26)

EX-215

GOV. SENTENCING MEMO.
NO. 3:19-CR-0226-RS-1

1    Beginning as early as August 30, 2017, and continuing through April 30, 2019, Lee conspired

2    with his drug supplier "Juan," drug couriers Evan Martinez Diaz and Cesar Alvarado, customer Jeffrey

3    McCoy, assistant Anthony Brown, and his ex-wife Deborah Polk to distribute controlled substances.

4    PSR ¶¶ 16-17.  Lee also conspired to distribute drugs with another major East Bay drug supplier Jose

5    Delgadillo (aka "Tepa") who had connections to Juan.  Jose Delgadillo was indicted in this case but fled

6    to Mexico after being released on bond.  PSR ¶ 12.

7    The evidence at trial showed that Lee's Mexico-based drug supplier Juan sent drug couriers to

8    Lee's Antioch residence and to Jose Delgadillo's apartment in Fairfield, California.  Defendant Jesse

9    Lopez III was one such drug courier who visited Lee's residence on May 15, 2018 and brought bags into

10   Lee's garage. *See* Dkt. 1 ¶¶ 101-114.  Lopez III left carrying a Nike swoosh bag and drove directly to

11   Jose Delgadillo's apartment complex in Fairfield where agents recorded Lopez III meeting with Jose

12   Delgadillo and his brother Marco Delgadillo in the parking lot.  After Lopez III departed, he was pulled

13   over by Fairfield Police who found four kilograms of fentanyl in the Nike swoosh bag and a plastic bag

14   with approximately $42,900 in cash in his car.  *Id.*



26   Although Lee temporarily held 20 pounds of methamphetamine at his Antioch house for Juan on

27   the night of February 8-9, 2019, there was no evidence in this case that Lee bought or sold

28

4

1  methamphetamine or bought or sold fentanyl.  This stands in contrast to Jose Delgadillo who supplied

2  methamphetamine to Humboldt County drug dealer Luis Torres Garcia and who sent his brother Marco

3  Delgadillo to deliver 18 pounds of methamphetamine to Torres Garcia on August 8, 2018.  Dkt. 1

4  ¶¶ 122-128.

5      The drug drop-offs and pickups from Lee's house on February 8-9, 2019 illustrate the significant

6  scale at which the drug conspiracy operated.

7      **1.    February 9, 2019 - Seizure of 6 Kilograms of Cocaine and 1 Kilogram of
        Heroin and $104,000 from courier Cesar Alvarado**

8

9      Through calls intercepted on February 8, 2019, agents learned about drug shipments that would

10  be moved on February 9, 2019.  On February 8, 2019, Lee spoke with Juan on an intercepted phone.

11  During the call Juan confirmed that he would be sending a courier to Lee's residence. Juan asked Lee

12  how many "tickets" (meaning money) Lee had, and Lee responded: "one hundred" (meaning $100,000).

13  In another call at 9:08 pm on February 8, Juan asked Lee whether a "friend" could come by Lee's house

14  to leave some "tickets" with Lee.  Lee confirmed that was fine.  PSR ¶ 25.

15     Around 9:22 pm, using a pole-camera, agents saw a black truck pull up to Lee's residence.  The

16  black truck was registered to the mother of defendant Evan Martinez-Diaz on Inlet Drive in Bay Point,

17  CA, which was then Martinez-Diaz's residence.  The pole camera footage showed a man get out of the

18  truck and briefly enter LEE's residence before returning to the truck and driving away.

19     Around 11:43pm, defendant Cesar Alvarado arrived at Lee's residence driving a black sedan

20  registered to Alvarado.  Alvarado stayed inside the sedan and slept through the night inside the car

21  parked outside of Lee's house.  PSR ¶ 25.

22     On February 9, 2019, around 7:22 am, agents intercepted a call between Lee and Juan, during

23  which Lee confirmed that the courier had arrived and slept in his car all night.  Juan asked Lee "you

24  haven't opened anything yet?"  Lee confirmed "no, I haven't opened up nothing yet."  Juan then

25  explained to Lee what narcotics Alvarado would be delivering to Lee, and what narcotics Alvarado was

26  delivering were to be picked up by Martinez-Diaz.  During the intercepted call, Lee confirmed that he

27  was receiving "5 apples" (five kilograms of cocaine) from Alvarado.  Juan also told Lee that Alvarado

28

GOV. SENTENCING MEMO.
NO. 3:19-CR-0226-RS-1

1    was leaving "20 onions and one apple" for "the guy who give you the money last night," referring to

2    Martinez-Diaz.  PSR ¶ 26.

3            Lee confirmed: "yeah, yeah, he told me to call him. He left his number, told me to call him.

4    When the guy wakes up and get ready to leave [U/I] his pieces."  This conversation is consistent with

5    later events, in that Martinez-Diaz returned to Lee's house that morning to pick up "his pieces" or "20

6    onions and one apple" (20 pounds of methamphetamine and one kilogram of cocaine).

7            Around 8:38 am, after Alvarado woke up.  Agents observed Alvarado remove two dark-colored

8    bags from the trunk of the vehicle and take the bags into Lee's garage.  A short time later, Alvarado

9    removed a red bag from the trunk of the sedan and carried it into the garage.  Around 8:57 am, a call

10   intercepted between Lee and Juan, during which Lee confirmed that Alvarado had delivered the

11   narcotics as expected and that Lee was going to give Alvarado $100,000 for the "5 apples" (five

12   kilograms of cocaine) that Lee was purchasing from Juan.  PSR ¶ 26.

13           **LEE:**           Everything is here.

14           **JUAN:**          Ok.

15           **LEE:**           Ok listen. I'm sending 100 Juan.

16           **JUAN:**          Ok.

17           **LEE:**           He's got 100.  Everything else I got 5 and 1 for the friend. And I got the
                                mashed potato.
18

19           **JUAN:**          Did he leave you the onions?

20           **LEE:**           Yeah, I didn't open that shit. So I don't know whatever the fuck that
                                is, that's what it is. [Unitelligble] left two fucking bags. I'm [Unintelligible] call
21                              the guy right now, but whatever it is, that's what it is. I didn't open that shit.

22           Around 8:59am, agents saw Alvarado exit Lee's garage carrying a light-colored bag.  PSR ¶ 27.

23   Alvarado opened the rear driver side door of his vehicle and moved around in the area between the rear

24   driver-side space and the opened door.  Around 9:22 am, Alvarado drove away from Lee's residence.

25   At 9:30 am, police conducted a traffic stop on Alvarado's vehicle and seized approximately 6 kilograms

26   of cocaine, 1 kilogram of heroin, two telephones, and approximately $104,505 in cash.  PSR ¶ 27.  The

27   drugs were packaged separately, with a portion inside the light-colored bag that Alvarado carried out of

28

GOV. SENTENCING MEMO.
NO. 3:19-CR-0226-RS-1

Lee's garage, and another portion found inside a hidden compartment in between the trunk and rear seat.

> **2.** **February 9, 2019 - Seizure of 20-lbs. of Methamphetamine and 1-kg of Cocaine (from courier Martinez Diaz)**

At 9:00 am, about one minute after Alvarado left LEE's garage, Lee called Martinez-Diaz.  Lee told Martinez-Diaz, "It's here waiting on you. The onions."  Martinez-Diaz responded, "Oh, yeah. I'll go right now."  Lee replied, "Ok good. Good. Yeah, he's got 20 of them here for you."  Lee's reference to "the onions" referred to the 20 pounds of methamphetamine that Alvarado had left for Martinez-Diaz. The apple referred to 1 kilogram of cocaine. PSR ¶ 28.

Around 9:54 am, Martinez-Diaz arrived at Lee's residence driving the same black truck that agents had seen visit Lee's residence the previous evening when he dropped off the "tickets" (cash). PSR ¶ 29.  Agents saw Anthony Brown exit Lee's residence and remove two dark-colored bags with white lettering from a trash can outside Lee's garage and place the bags into the back of the black truck. *Id.*  As seen on the pole-camera still image shown below on the left, Martinez-Diaz put the two bags inside a plastic trash bag and then tied the bags to the bed of the truck as Lee watched.  *Id.*



When Martinez-Diaz's black truck left Lee's house, agents attempted to maintain surveillance on it but were unable to do so as the black truck began driving erratically.  The black truck temporarily lost surveillance vehicles before law enforcement reacquired surveillance.  At approximately 10:08 am, police pulled over the black truck. PSR ¶ 29.  During the traffic stop, officers identified the driver as

GOV. SENTENCING MEMO.
NO. 3:19-CR-0226-RS-1

Martinez-Diaz and the passenger. *Id.* There was no contraband in the black truck at the time of the traffic stop, and there was no sign of the two bags that agents conducting surveillance had seen loaded into the black truck. *Id.*

Agents searched for the bags along the suspected path of the black truck after agents had lost visual contact. A DEA agent located the bags on Ferngrove Way in Antioch. The packaging was the same – a large trash bag with two smaller bags inside – as it had been when the drugs were loaded into the truck at Lee's residence. PSR ¶ 29.

Agents also obtained video footage from a security camera on Ferngrove Way, showing what appears to be Martinez-Diaz's black truck stopping at the location where the bags were found. The video showed the passenger exit the vehicle and place something near a tree in the same location where the bags were located. PSR ¶ 30.

After the seizures, at approximately 11:25 am, a call was intercepted between Lee and Juan. Juan complained to Lee that his courier was followed by the police and had to "throw the stuff." Lee responded: "Juan, he couldn't have threw it. Everything was in the back of the truck." PSR ¶ 30.

Lee then spoke with Martinez-Diaz at about 11:37 am. During the call, Martinez-Diaz confirmed to Lee that had had to discard the drugs when he detected that he was being followed. Martinez-Diaz told Lee: "I had to throw that shit . . . what was I supposed to do?" PSR ¶ 30.

During a call with Lee at 11:57am (Trial Exhibit 415), Martinez-Diaz recounted in detail for Lee what happened when he left Lee's residence, said that he realized he was being followed, temporarily lost police surveillance, and then had his "boy" throw the drugs he was carrying into the bushes. This account is corroborated by the video footage of the black truck stopping by the roadside that was recovered from a homeowner on Ferngrove Way. PSR ¶ 30.

### B.    Other Section 3553(a) Factors

The defendant is 70 years old. PSR at 3. He has performed well during an extended period of pretrial release. PSR ¶ 4. He is currently employed full time as a delivery driver with Amazon. PSR ¶ 82. In terms of avoiding unwarranted sentencing disparities, the government notes that Lee was a cocaine supplier to street-level dealer Jeffrey McCoy who was involved in multiple controlled sales of

1   drugs and received a 60-month sentence.  PSR ¶ 9.  Lee's role in the conspiracy was also much more

2   significant than defendant Marco Delgadillo who acted as the courier for a methamphetamine shipment

3   and received a prison sentence of 36 months.  PSR ¶ 6.  On the other hand, in contrast to his co-

4   conspirator Jose Delgadillo, Lee did not sell methamphetamine or fentanyl and did not flee while on

5   pretrial release.  While Lee he did allow his Antioch house to be used as a stash place for

6   methamphetamine, Lee's drug distribution throughout the conspiracy focused on cocaine.

7   **IV.      CONCLUSION**

8           In accordance with the parties' plea agreement, the government makes no specific

9   recommendation on a term of imprisonment for the defendant.

10

11  DATED:  April 8, 2024                              Respectfully submitted,

12

13                                                     ISMAIL J. RAMSEY
                                                       United States Attorney

14                                                     /s/
15                                                     _____
                                                       DANIEL PASTOR
16                                                     JOSEPH TARTAKOVSKY
                                                       Assistant United States Attorneys

17

18

19

20

21

22

23

24

25

26

27

28

GOV. SENTENCING MEMO.
NO. 3:19-CR-0226-RS-1